1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**United States District Court**
For the Northern District of California

THOMAS BOWER,

          Plaintiff,

   v.

CITY AND COUNTY OF SAN
FRANCISCO,

          Defendant.
_____/

No. C 09-03507 CRB

**ORDER GRANTING SUMMARY
JUDGMENT**

     Plaintiff Tom Bower developed multiple sclerosis (MS) during the brief time in which he was employed as an engineer in San Francisco's Department of Building Inspection (DBI). He alleges that his "release from probation" (essentially a demotion) in September 2006 was the result of disability discrimination and retaliation. Defendant City and County of San Francisco has moved for summary judgment, arguing that Plaintiff is not disabled, that the City accommodated him, and that his retaliation claim should not prevail. The Court agrees and GRANTS the Defendant's Motion.

**I.**     **BACKGROUND**

    **A.**    **Plaintiff's Job Performance**

     Plaintiff joined DBI's residential unit in January 2006 as a civil engineer. Tom Dep. at 35:8-16. He began on probation, meaning that if he succeeded, he would become a permanent

United States District Court
For the Northern District of California

1    employee, and if he failed, he would be demoted back to associate civil engineer.  Id. at

2    19:22-20:8.  The group Plaintiff joined was responsible for doing plan checking and building

3    inspection under the supervision of Chief Building Inspector Ron Tom.  Id. at 36:3-11; see

4    also Pl. Decl. ¶ 4.  The group was facing a "big backlog" of plans at the time, and Tom

5    wanted everyone to increase their productivity.  Pl. Dep. at 71:5-21.

6        Plaintiff prided himself on being more diligent and cautious than other members of his

7    group.  Id. at 99:11-17.  He criticized the other engineers for not adequately reviewing the

8    plans they were responsible for.  Id. at 100:12-25.  However, he concedes that his more

9    cautious approach might have led him to struggle to keep up with the numerical requirements

10    asked of him.  Id. at 101:9-14.  Plaintiff also received a number of phone calls complaining

11    about his work.  Id. at 97:23-98:2.

12        Productivity was Tom's "number one issue with [Plaintiff]."  Tom Dep. at 120:11-13.

13    A series of meetings between the two men addressed Plaintiff's performance, and his lack of

14    productivity.[1]  On April 27, 2006, Plaintiff had a first meeting with Tom, who, Plaintiff

15    noted, "causally ask[ed him] to pick up the pace just a little bit."  Ex. E at 38 of 80.  Tom's

16    notes of the meeting reflect discussion of increasing Plaintiff's plan approval rate.  Ex. F.  On

17    May 19, 2006, Plaintiff had a second meeting with Tom, who asked Plaintiff  "why his

18    performance has gone down."  Ex. E at 38 of 80.  Tom's notes of the meeting state "week to

19    week backlog – last 3 weeks no improvement."  Ex. F.  On June 9, 2006, Plaintiff again met

20    with Tom; Tom's notes from the meeting state: "priority– upgraded productivity. goal – 4

21    plans started per week."  Id.  On June 28, 2006, Plaintiff met with Tom again; Tom's notes

22    from the meeting state: "Quantity of plans reviewed not in sinc [sic]."  Id.

23        On June 30, 2006, Tom presented Plaintiff with his first formal Performance

24    Appraisal Report, in which Tom checked off "Development Needed" for both the

25    "Knowledge of Job" and "Quantity of Work Performed" categories.  Ex. C (the latter

26    category states: "quantity of work does not meet job requirements in some areas (primarily

27

28        [1] There is also a great deal of evidence in the record, not included here, about Defendants' efforts
to mentor Plaintiff.

United States District Court
For the Northern District of California

1  structural plan checking)"). Plaintiff presented Tom with a written Rebuttal to the June 30

2  Appraisal, challenging Tom's expectations for the group and stating, "producing more plans

3  per week than what the engineering group feels is more than a reasonable and manageable

4  average . . . creates an unachievable goal for the group and myself." Ex. C (last page)

5  (Rebuttal). Although Plaintiff now states that, through the Rebuttal, he "expressed [his]

6  concern that [he] was being treated differently than the other non-Asian and non-disabled

7  employees of SF-DBI," Pl. Decl. ¶ 35, the Rebuttal mentions nothing about race or disability,

8  or even that Plaintiff was treated differently than his peers. See Ex. C (last page) (Rebuttal).

9  In response to the Rebuttal, Tom extended Plaintiff's probation end date from July 13 to

10  September 11. Tom Dep. 34:25-35:11.

11       On July 12, 2006, Plaintiff met again with Tom; Tom's notes reflect that "[Plaintiff]

12  has not met the minimum standards for managing his backlog." Ex. F. The notes reflect that

13  "[Plaintiff] intimated that he doesn't want to compromise his integrity by just simply starting

14  a plan to get it off the backlog," and that he "objected to Ron's min. standard of 4 new plans

15  and 4 rev. reviewed per week." Id. Tom's notes further state that the Plaintiff "hasn't been

16  given expanded duties and that he wasn't expected to perform" at the same level as someone

17  who had been at DBI longer, that DBI had made an effort to find mentors for Plaintiff, and

18  that Plaintiff's "lack of cooperation and unwillingness to take responsibility for his own lack

19  of performance was very troubling." Id. Tom recalled at the time having problems with

20  Plaintiff's lack of productivity, and wanting Plaintiff to "bring[] resolution to the projects he

21  already started." Tom Dep. 141:13-142:5. Tom's notes from a June 13, 2006 meeting with

22  Plaintiff state "critical to demonstrate overall plan check improvement." Ex. F.

23       Plaintiff met with Tom again on August 8, 2006; Tom's notes state "Biggest issue is

24  dealing w/ the large amount of revisions– numerous complaints by applicants." Id. On

25  August 17, 2006, the two met again; Tom's notes reflect that the goal of completing a plan

26  within seven calendar days was not being met, and that he asked Plaintiff to give his four

27  oldest plans to another engineer to complete. Id.

28

United States District Court
For the Northern District of California

1      On August 23, 2006, Tom provided Plaintiff with his second formal Performance

2  Appraisal Report, in which Tom checked off "Development Needed" for "Knowledge of

3  Job," "Quantity of Work Performed," and "Quality of Work Performed." Ex. E.  As to

4  quantity, the appraisal states: "structural plan check approvals lags behind peers." Id.  As to

5  quality, the appraisal states: "incomplete plan check comments for complex projects." Id.

6  Soon after this meeting, on September 6, 2006, Tom released Plaintiff from probation.  Tom

7  Dep. 34:10-15.

8      **B.     Plaintiff's Illness**

9      On the morning of April 26, 2006, when Plaintiff had been working at DBI for nearly

10  four months, he woke up with numbness in his leg.  Pl. Dep. 57:4-17.  The numbness was a

11  persistent symptom, although Plaintiff had "full strength in it." Id. 59:5-9.  He also had eye-

12  twitching "every once in a while" and "a little bit of numbness" in his hand "sometimes." Id.

13  59:16-23.  These symptoms led to a May 26, 2006 diagnosis of MS.  Ex. E at 38 of 80.

14  Plaintiff's doctor gave him a prescription for a series of shots to slow the onset and growth of

15  his MS.  Pl. Decl. ¶ 14.  However, the shots "themselves had their own specific debilitating

16  impacts," making Plaintiff nauseated and extremely fatigued for about 24 hours afterward.

17  Id. ¶ 17.

18      Plaintiff testified as follows about the impact of his MS on his job:

19      Q. So other than the time that you needed it actually get to the injection clinic or the
        doctor, did your MS in any other way impact your ability to do your job; for instance,
20      did your leg numbness impact your ability to do your job?
        A. I don't think so.  I even ran a marathon with my leg like that.
21      Q. When was that?
        A. July 2006 or something like that.
22      Q. So other than what you've testified, nothing impacted your ability to do your job?
        A. I – just needing to go to the doctor and needing the time off to get this thing seen.
23
     Pl. Dep. 60:18-61:5.[2]
24
25      Specifically, Plaintiff needed two hours off each Friday to get his shots.  Pl. Decl. ¶

26  18.  He asserts in his declaration: "The reasonable accommodation that I sought was to be

27  allowed to leave on Friday afternoons for the purpose of seeing a doctor and physician's

28      _____

        [2] In contrast to his disability, Plaintiff testified that his wife unexpectedly moving out and filing
     for divorce in this same time frame "was disruptive." Pl. Dep. at 35:8-21.

4

**United States District Court**
For the Northern District of California

assistant to obtain a series of shots." Id. ¶ 13.  On July 12, 2006, Plaintiff asked Tom for permission to regularly leave the office on Friday afternoons to get the shots (and not to work at DBI's public counter during that same time).  Id. ¶ 15.  Tom indisputably agreed to let him do so.  Id.  Tom testified that he did not know of Plaintiff's diagnosis, and was "not aware" that the shots Plaintiff needed had anything to do with MS.  Id. ¶ 43.  Plaintiff further testified that Tom "said he hoped it's not serious," but never expressed that Plaintiff's absences were causing a problem in terms of his performance.  Pl. Dep. 87:23-88:13.

Plaintiff told only a handful of people at work about his diagnosis.  Pl. Dep. 53:11-17. On July 7, he informed Department of Human Resources manager Jenna Lee of his diagnosis and that he was concerned about missing time for medical appointments.  Id. 66:16-19; 68:3-14.  Lee later informed Plaintiff that she had communicated the diagnosis to Taras Madison, DBI Chief Administrative Officer.  66:1-7.  On July 11, 2006, Madison sent Plaintiff a Reasonable Accommodation Information and Request Form, stating,

> Please complete and return the two forms to me . . . as soon as possible.  After receiving these completed forms, we will meet with you to review the City's reasonable accommodations process.  As part of this process, the department will identify the essential functions of your position and, with your written consent, may contact your identified health care provider(s) to obtain necessary information, including how your medical condition impacts your ability to perform the essential functions of your job.  Unless your disability is obvious, your request will not be processed without this information.

Ex. J.

Plaintiff did not fill out the Reasonable Accommodation request form; he thought "it would imply that I am unfit to do the work, I did not feel I needed to fill out the reasonable accommodations form."  Pl. Decl. ¶ 15.  He testified that it seemed that the form "didn't really apply to me," because "I can walk, I can breathe, I can talk, I can hear, I can see, I can learn."  Pl. Dep. 69:1-10.  He did not consider that he had an "obvious" disability.  Id. 69:11-15.  He explained "I thought this was for a situation where you need a special cubicle designed or a wheelchair ramp.  Instead I just asked Ron Tom for permission to take Friday afternoon's [sic] off to get my MS shots, and Ron Tom said yes."  Pl. Decl. ¶ 42.

Although Defendants granted the only request Plaintiff made for an accommodation (his informal request of Tom for two hours off each Friday afternoon), Plaintiff alleges that

Tom "refused to reduce my work load in a proportionate manner, to allow time off for the shots." Pl. Decl. ¶ 20.  Indeed, instead of reducing his work load, Plaintiff alleges that he "received the added increase in work load as of June 30, 2006, requiring [him] to complete approximately 33% more permit reviews and plan comments than the other existing engineers." Id. ¶ 21.  There is a dispute of fact as to whether, as Plaintiff now alleges, only he was asked to increase his productivity to do four new plans a week, see id. ¶ 25 ("higher requirement on me of four new plan review and four revisions per week . . . constituted 33% more workload than what was being required of the other staff engineers"), or whether, as the contemporaneous documents suggest, this was a goal set for the entire group, see Ex. C (Rebuttal) ("creates an unachievable goal for the group and myself"); and Pl. Dep. at 71:5-21 (agreeing that "the expectation being placed on them was the same as what was placed on you").[3]

### C.    Procedural History

On July 3, 2007, Plaintiff filed an employment discrimination charge with the EEOC, claiming discrimination based solely on disability, and claiming retaliation.  Hecimovich Decl. Ex. B.  Nearly two years later, on April 22, 2009, well after the statutory filing deadline had passed, Plaintiff attempted to amend his charge by adding claims for racial discrimination, religious discrimination, and retaliation based on race and religion. Hecimovich Decl. Ex. H.  On July 31, 2009, Plaintiff filed the instant action, claiming disability discrimination and retaliation under the Americans with Disabilities Act (ADA), and racial discrimination, religious discrimination, and retaliation under Title VII.  See generally Compl.  In October, 2010, the Court granted Defendants' motion to dismiss all but the disability-based claims.  See dckt. no. 32 (hearing minutes).  Defendants now move for summary judgment on the remaining claims.  See generally MSJ (dckt. no. 33).

## II.    LEGAL STANDARD

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  A

---

[3] As explained below, this dispute of fact is not material to the outcome of this suit.

United States District Court
For the Northern District of California

party moving for summary judgment that does not have the ultimate burden of persuasion at trial (usually the defendant) has the initial burden of producing evidence negating an essential element of the non-moving party's claims or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied.  If, on the other hand, the moving party has satisfied its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.  Nissan Fire & Marine Ins. Co., 210 F.3d at 1102.  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).  Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.  See id.

## III.   DISCUSSION

### A.   Disability Discrimination

To state a claim of discrimination under the ADA, a plaintiff must show that he is a qualified individual with a disability who suffered an adverse employment action due to his disability.  See Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1353 (9th Cir. 1996).

#### 1.   Whether Plaintiff was "Disabled"

Plaintiff's claims relate to events that occurred in 2006, before the ADA's amendment in 2009, and so the pre-2009 version of the ADA governs.  See Becerril v. Pima

United States District Court
For the Northern District of California

1   County Assessor's Office, 587 F.3d 1162, 1164 (9th Cir. 2009).  That version of the ADA

2   defines "disability" as: (1) a physical impairment that substantially limits one or more of the

3   major life activities; (2) a record of such impairment; or (3) being regarded as having such an

4   impairment. 42 U.S.C. § 1212(2) (1990).  There is no evidence that either of the last two

5   definitions apply to this case, and so the question is whether Plaintiff meets the first

6   definition.  He does not.

7        Whether an individual is substantially limited in a major life activity is "not

8   necessarily based on the name or diagnosis of the impairment the person has, but rather the

9   effect of that impairment on the life of the individual."  Albertson's, Inc. v. Kirkingburg, 527

10  U.S. 555, 566-567 (1999) (internal quotation marks omitted).  That determination must be

11  made on "a case by case basis."  Id.

12        Plaintiff's MS was unquestionably a physical impairment.  But he has failed to

13  produce any evidence that it substantially limited a major life activity.  An impairment

14  substantially limits a major life activity if it is permanent or long term and it "prevents or

15  severely restricts an individual from doing activities that are of central importance to most

16  people's daily lives." Toyota Motor Mfg., Ky. Inc. v. Williams, 534 U.S. 184, 198 (2002)

17  superceded by statute as stated in Verhoff v. Time Warner Cable, Inc., 299 Fed. Appx. 488,

18  492 (6th Cir. 2008).  First, Plaintiff has failed to identify any life activity that was affected by

19  his MS, specifically stating "I can walk, I can breathe, I can talk, I can hear, I can see, I can

20  learn." Pl. Dep. at 69:1-10.  See also Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117,

21  1129 (10th Cir. 2003) (court is to analyze only those impairments and life activities that the

22  plaintiff articulates with precision).  And second, he has failed to demonstrate that any

23  limitation on a major life activity– such as working– is substantial.  Plaintiff experienced

24  persistent numbness in his leg, although he was able to run a marathon on it, and he had

25

26

27

28

United States District Court
For the Northern District of California

occasional eye-twitching and mild numbness in his hand.  Pl. Dep. at 59:5-61:5.  But even he

did not think that these symptoms impacted his ability to do his job.  Pl. Dep. 60:18-61:5.[4]

Plaintiff argues that "[m]ultiple sclerosis has been held to be a disability under the

ADA in at least some circumstances."  Opp. at 11.  This is true, and the Court would not

suggest otherwise.  Plaintiff cites to Braunling v. Countrywide Home Loans, Inc., 220 F.3d

1154, 1157 (9th Cir. 2000), in which the court considered disabled a plaintiff who was

diagnosed with MS and "suffer[ed] some of the debilitating consequences of the disease such

as poor ambulation ability and extreme fatigue."  But Braunling is distinguishable, given that

Plaintiff here suffered no symptoms that could be characterized as "debilitating."  Moreover,

just as some courts have concluded that individuals with MS are disabled, see, e.g., Moritz v.

Frontier Airlines, Inc., 147 F.3d 784, 786-87 (8th Cir. 1998), others have concluded that

individuals with the same disease are not, see, e.g., Mead v. Bank of America, No. 3:06-cv-

00626-HDM-VPC, 2008 WL 706632, at *3 (D. Nev. Mar. 14, 2008) ("While the court is

mindful of the progressive and often erratic nature of plaintiff's condition, plaintiff's

description of the isolated difficulties she experienced with her eyesight does not meet the

'substantial limitation' standard under the ADA"); Berry v. T-Mobile USA, Inc., 490 F.3d

1211, 1217-18 (10th Cir. 2007) ("Berry suffered from extreme fatigue which would cause

cognitive difficulties, temporary postponement of activities and, on occasion, result in a fall,"

but "her activities were not substantially limited"); see also Croy v. Cobe Laboratories, Inc.,

345 F.3d 1199, 1204 (10th Cir. 2003); Johnson v. Weld Cty., No. 06-cv-02362-JLK, 2008

WL 4402247, at *12 (D. Colo. Sept. 24, 2008).

Based on the record presented, the Court finds that Plaintiff was not disabled.

### 2.      Whether Plaintiff was Provided Reasonable Accommodation

---

[4] Plaintiff argued in his Opposition brief and at the motion hearing that the nausea and fatigue he experienced within 24 hours of receiving his shots was a substantial limitation, see Pl. Decl. ¶ 17, but he has failed to link such symptoms to a major life activity.  See Johnson v. Weld Cty., No. 06-cv-02362-JLK, 2008 WL 4402247, at *14 (D. Colo., Sept. 24, 2008) ("The ability to live free of headaches is not a major life activity in the abstract, and must be linked to one before an inference that her MS is disabling will arise").  As to the major life activity of working, Plaintiff received his shots on Friday afternoons, and so the nausea and fatigue he experienced on Friday night and Saturday day would not have affected his job.

Discrimination under the ADA includes "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." See 42 U.S.C. § 12112(b)(5)(A); McAlindin v. County of San Diego, 192 F.3d 1226, 1236 (9th Cir. 1999), opinion amended on denial of rehearing, 201 F.3d 1211 (9th Cir. 2000). Even if Plaintiff were disabled, Defendant provided Plaintiff with reasonable accommodation.

Because a plaintiff bears the burden of establishing an ADA violation, he "must establish the existence of specific reasonable accommodations that [the defendant] failed to provide." See Memmer v. Marin County Courts, 169 F.3d 630, 633 (9th Cir. 1999). Here, Plaintiff states in his declaration: "The reasonable accommodation that I sought was to be allowed to leave on Friday afternoons for the purpose of seeing a doctor and physician's assistant to obtain a series of shots." Id. ¶ 13. Ron Tom agreed to this accommodation, Id. ¶ 15; ¶ 42 ("Ron Tom said yes.").

Plaintiff now argues that a reduced workload would have also been a reasonable accommodation, see Opp. at 16 (arguing that without a reduced workload, "it was as though Ron Tom didn't provide an accommodation at all"), but the record does not reflect that he ever asked for one. Certainly Plaintiff objected to Tom's workload expectations and characterized his new goal as "unachievable." See Ex. C (last page) (Rebuttal). But not because of his MS; the record does not reflect Plaintiff ever expressing to Defendant that his workload was unmanageable because of his MS, or asking for less work as an accommodation for his MS. Plaintiff was specifically provided with a Reasonable Accommodation request form and he declined to fill it out. Pl. Decl. ¶ 15. See Jensen v. Wells Fargo Bank, 85 Cal. App. 4th 245, 263-64 (2000) (employer entitled to summary judgment on ADA claim where reasonable accommodation was offered and refused). Moreover, as his was not an "obvious" disability, Pl. Dep. at 69:11-15, Plaintiff was on notice that an accommodation "[would] not be processed without" necessary information, including how his medical condition impacted his ability to perform the essential function of

10

**United States District Court**
For the Northern District of California

1  his job, see Ex. J.  Because Plaintiff never completed the form, that necessary information

2  was not provided to Defendant.[5]

3      Based on the record, Defendant provided Plaintiff with the only reasonable

4  accommodation he requested.  For this reason, as well as his lack of a disability under the

5  statute, Plaintiff's disability discrimination claim fails.

6      **B.**    **Retaliation**

7      "To establish a prima facie case of retaliation under the ADA, an employee must show

8  that: (1) he or she was engaged in a protected activity; (2) suffered an adverse employment

9  action; and (3) there was a causal link between the two."  Pardi v. Kaiser Found. Hospitals,

10  389 F.3d 840, 849 (9th Cir. 2004).  Once an employee establishes a prima facie case, he will

11  avoid summary judgment unless the employer offers legitimate reasons for the action, at

12  which point the burden shifts back to the employee to demonstrate that there is a triable issue

13  of fact as to whether those reasons are pretextual.  Id.

14      "Protecting one's rights under the ADA constitutes a protected activity."  Id. at 850.

15  Here, however, it does not appear to the Court that Plaintiff was protecting his rights, or

16  engaging in any other protected activity.  Plaintiff's retaliation claim is based on his June 30,

17  2006 Rebuttal[6]: "things between Ron Tom and [Plaintiff] were in a good way as of the initial

18  meeting about Mr. Ron Tom's first probationary report, but became quite negative after

19  [Plaintiff] discussed and submitted a written objection to the 4 per week workload goal."

20  Opp. at 19; see also Pl. Decl. ¶ 40 ("things . . . became quite negative after I discussed and

21  submitted a written objection to the 4 plan approval-- and 4 plan reviews- per-week workload

---

23      [5] Plaintiff argued in his Opposition brief and again at the motion hearing that Tom did not follow the City's ADA protocol by informing his supervisor, Madison, of his request for time off for shots, and that if Tom had done so, "someone with administrative expertise [would have been made] aware of the situation and [could have ] determine[d] the full array of issues the employee needs and the specific accommodation required."  See Opp. at 15, citing Ex. G at 8 ("supervisor must immediately notify the department's Reasonable Accommodation ('RA') Coordinator").  But Plaintiff does not dispute that Madison was already aware of the situation, having been informed by Jenna Lee, and in fact gave Plaintiff a Reasonable Accommodation request form, Ex. J., which he chose not to complete.  His argument is therefore moot.

28      [6] It is not, nor can it be, based on the increase in workload Plaintiff alleges that only he received– that allegedly took place before Plaintiff had informed anyone at work about his diagnosis.  See Pl. Decl. ¶ 21; Pl. Dep. 68:3-14.

United States District Court
For the Northern District of California

goal on June 30, 2006"). Plaintiff testified that if he hasn't given Tom the June 30, 2006 Rebuttal, "then he would probably pass me on probation." Pl. Dep. at 105:5-11. The Opposition states: "[Plaintiff] was retaliated against because he took issue with his increased workload." Opp. at 20. (It continues, oddly, to argue, "[Plaintiff's] objection took issue with the fact that he was being singled out as the one non-Asian engineer for higher work assignments." Id.).

But neither the text of the June 30, 2006 Rebuttal nor anything else Plaintiff has pointed to in the record ties the Rebuttal to Plaintiff's MS. But see Pl. Decl. ¶ 35 (stating that, through the Rebuttal, Plaintiff "expressed [his] concern that [he] was being treated differently than the other non-Asian and non-disabled employees of SF-DBI"). There is no evidence in the record to support a reasonable inference that Ron Tom knew at the time of the Rebuttal that Plaintiff had been diagnosed with MS. See Pl. Dep. at 63:15-24 ("He knew I was seeing the doctor"); Tom Dep. 173:9-177:15 (no contemporaneous knowledge of MS), 181:18-23 (no mention of MS).

Even if Plaintiff had established a prima facie case of retaliation, Defendant has offered a convincing legitimate reason for releasing Plaintiff from probation: his productivity problems, which predate both his diagnosis and the disclosure of his illness. See generally Ex. F (Tom's notes of meetings detailing problems with productivity, backlogs, etc.). See Slattery v. Swiss Reinsurance Am., 248 F.3d 87, 95 (2d Cir. 2001) (where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise"); Rheineck v. Hutchinson Tech., 261 F.3d 751, 757-58 (8th Cir. 2001) (criticism of plaintiff before incident complained of dispels inference of retaliation). Plaintiff has not demonstrated that there are triable issues of fact as to whether Defendant's reasons are pretextual. Id.

Accordingly, Plaintiff's retaliation claim also fails.

//

//

//

12

1    **IV.    CONCLUSION**

2         For the foregoing reasons, the Court GRANTS Defendant's Motion.

3         **IT IS SO ORDERED.**

4

5

6    Dated: February 14, 2011                    CHARLES  R. BREYER
                                                 UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California